UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

MATT AUFFENBERG & JAMES          )
AUFFENBERG JR.,                  )
                                 )
        Plaintiff,               )
                                 )
vs.                              )      NO.: 3:23-cv-1887-GCS
                                 )
ADDMI, INC. and <u>ANDY LIM</u>,          )
                                 )
        Defendant.               )

## <u>SECOND AMENDED COMPLAINT</u>

Come now, the Plaintiffs, Matt Auffenberg and James Auffenberg Jr., by and through their attorney Jarrod P. Beasley of Kuehn, Beasley & Young, P.C., and hereby states this cause of action against Defendants, AddMi, Inc. and <u>Andy Lim</u>,:

## COUNT 1 – BREACH OF CONTRACT – ADDMI

1. Plaintiff Matt Auffenberg is a <u>citizen for diversity jurisdiction purposes</u> of the State of Illinois, <u>as he is</u> domiciled within St. Clair County, Illinois.

2. Plaintiff James Auffenberg Jr. is a <u>citizen for diversity jurisdiction purposes</u> of the State of Illinois, <u>as he is</u> domiciled within St. Clair County, Illinois.

3. On information and belief, at all times relevant, Defendant AddMi, Inc. ("AddMi") was and is a corporation organized and existing under the laws of the state of Delaware having its principal place of business in New Mexico.  <u>Because a corporation is considered a citizen of both its state of incorporation and the</u>



state where it has its principal place of business, it is a citizen of both New Mexico and Delaware for purposes of federal diversity jurisdiction.

4. Defendant Andy Lim is domiciled in New Mexico. Because he is domiciled in New Mexico, Andy Lim is a citizen of New Mexico for purposes of federal diversity jurisdiction.

5. The amount in controversy, as described more fully below, is in excess of $75,000.00.

6. Because all plaintiffs are citizens of Illinois for federal diversity jurisdiction purposes, all defendants are diverse, and the amount in controversy exceeds $75,000.00, this Court has diversity jurisdiction as provided under 28 USC § 1332.

7. On or about May 13, 2020, Plaintiff Matt Auffenberg and Defendant executed a Convertible Promissory Note in the original principal amount of $300,000.00 to evidence Defendant's indebtedness to Matt Auffenberg. A true and correct copy of the Convertible Promissory Note #1 is attached hereto as Exhibit A and incorporated herein.

8. Pursuant to the terms of Note #1, the note matured on May 12, 2022, and Defendant became obligated to pay Matt Auffenberg the aforesaid principal amount of $300,000.00, plus all accrued interest, in one payment of all outstanding principal and all unpaid interest.

9. Plaintiff Matt Auffenberg has made multiple demands for payment of Note #1.

10. To date no payments have been made on the indebtedness.

11. On or about June 29, 2020, Plaintiff Matt Auffenberg and Defendant executed a Convertible Promissory Note in the original principal amount of $200,000.00 to evidence Defendant's indebtedness to Matt Auffenberg. A true and correct copy of the Convertible Promissory Note #2 is attached hereto as Exhibit B and incorporated herein.

12. Pursuant to the terms of Note #2, the note matured on May 12, 2022, and Defendant became obligated to pay Matt Auffenberg the aforesaid principal amount of $200,000.00, plus all accrued interest, in one payment of all outstanding principal and all unpaid interest.

13. Plaintiff Matt Auffenberg has made multiple demands for payment of Note #2.

14. To date no payments have been made on the indebtedness.

15. On or about August 31, 2020, Plaintiff Matt Auffenberg and Defendant executed a Convertible Promissory Note in the original principal amount of $500,000.00 to evidence Defendant's indebtedness to Matt Auffenberg. A true and correct copy of the Convertible Promissory Note #3 is attached hereto as Exhibit C and incorporated herein.

16. Pursuant to the terms of Note #3, the note matured on May 12, 2022, and Defendant became obligated to pay Matt Auffenberg the aforesaid principal

amount of $200,000.00, plus all accrued interest, in one payment of all outstanding principal and all unpaid interest.

17. Plaintiff has made multiple demands for payment of Note #3.

18. To date no payments have been made on the indebtedness.

19. On or about February 2, 2023, Plaintiff Matt Auffenberg and Defendant executed a Convertible Promissory Note in the original principal amount of $325,000.00 to evidence Defendant's indebtedness to Matt Auffenberg. A true and correct copy of the Convertible Promissory Note #4 is attached hereto as Exhibit D and incorporated herein.

20. Pursuant to the terms of Note #4, the note matured on November 1, 2023, and Defendant became obligated to pay Matt Auffenberg the aforesaid principal amount of $325,000.00, plus all accrued interest, in one payment of all outstanding principal and all unpaid interest.

21. Plaintiff Matt Auffenberg has made demand for payment of Note #4.

22. To date no payments have been made on the indebtedness.

23. On information and belief, Defendant, through its CEO Andy Lim has violated the terms of the notes, Section 3(ix), by comingling funds, using corporate funds for his personal, family or household use rather than exclusively for the operations of its business.

24. Pursuant to the terms of Notes #1, #2, #3, and #4 Defendant was obligated to pay 7% interest on the notes.

25. As of the date of this filing, Defendant was and is in default by reason of its failure to pay all principal and accrued interest upon the maturity of the Notes and the requests for satisfaction.

26. As of November 17, 2023, a principal balance of $1,325,000, remains due on the Notes, together with accrued interest in the amount of $251,654.79.

27. By reason of the foregoing, Matt Auffenberg has been damaged in the aggregate sum of $1,576,654.79 as of November 17, 2023.

28. Per the terms of the Notes, Section 4(b), Defendant is also responsible for the payment of all attorney fees and Court costs accrued in enforcing the terms of these agreements.

WHEREFORE, Plaintiff prays this Court enter its Judgment for Plaintiff Matt Auffenberg in an amount to be determined, plus costs and attorney fees and for such further relief as this Court deems just and proper.

## COUNT II – BREACH OF CONTRACT - ADDMI

29. Plaintiff James Auffenberg Jr. is a resident of the State of Illinois, within St. Clair County, Illinois.

30. On information and belief, at all times relevant, Defendant AddMi, Inc.

    ("AddMi") was and is a corporation organized and existing under the laws of the

    state of Delaware having its principal place of business in New Mexico.

31. In 2020, Plaintiff and Defendant executed a Convertible Promissory Note in the

    original principal amount of $1,000,000.00 to evidence Defendant's indebtedness

    to James Auffenberg Jr.  A true and correct copy of the Convertible Promissory

    Note is attached hereto as Exhibit E and incorporated herein.

32. Pursuant to the terms of Convertible Promissory Note, the note matured in its

    entirety on May 12, 2022, and Defendant became obligated to pay James

    Auffenberg the aforesaid principal amount of $1,000,000.00, plus all accrued

    interest, in one payment of all outstanding principal and all unpaid interest.

33. Plaintiff has made multiple demands for payment of the Convertible Promissory

    Note.

34. To date no payments have been made on the indebtedness.

35. As of the date of this filing, Defendant was and is in default by reason of its

    failure to pay all principal and accrued interest upon the maturity of the

    Convertible Promissory Notes and the requests for satisfaction.

36. As of November 17, 2023, a principal balance of $1,000,000.00, remains due on

    the Convertible Promissory Notes, together with accrued interest in the amount

    of $163,828.77.

37. By reason of the foregoing, James Auffenberg has been damaged in the aggregate sum of $1,163,828.77 as of November 17, 2023.

38. Per the terms of the Convertible Promissory Notes, Section 4(b), Defendant is also responsible for the payment of all attorney fees and Court costs accrued in enforcing the terms of these agreements.

WHEREFORE, Plaintiff prays this Court enter its Judgment for Plaintiff James Auffenberg, Jr. in an amount to be determined, plus costs and attorney fees and for such further relief as this Court deems just and proper.

## COUNT III – COMMON LAW FRAUD - ADDMI

39. Plaintiffs re-allege ¶¶1-38 as if fully stated herein.

40. Based on the results of previous discovery in both this case and the bankruptcy case, the loans were acquired through fraud by Mr. Lim, an agent of Addmi.

41. Additionally, Mr. Lim has, on information and belief, during the pendency of this claim, and knowing he would likely have to answer for this fraud, transferred his residence and other assets to other entities, including his home which was transferred via quitclaim deed on September 11, 2023 to a trust created August 17, 2023, titled DragonLim Family Trust.

42. Each of the Notes at issue, contain similar terms, including Section 3(ix) which explicitly states "The Company shall use the proceeds of this Note solely for the

operations of its business, and not for any personal, family or household purpose.

43. Andy Lim signed these documents on behalf of Defendant and agreed to these terms.

44. Despite agreeing to abide by the terms of the agreement, on information and belief, Defendant Andy Lim has violated the terms of the Notes by comingling funds, using corporate funds for his personal, family or household use rather than exclusively for the operations of its business.

45. Defendant Lim testified in the Addmi bankruptcy that he repaid loans made by Mr. Lim and there are still loans from Mr. Lim to the corporation. None of these alleged loans were ever disclosed to plaintiffs.

46. Following the first wire from Plaintiff Matt Auffenberg in May of 2020, within a week, Andy Lim paid himself $29,500.00 via company to check. The check was both written and signed by Andy Lim for his benefit. See Note 1 attached as Exhibit A.

47. Andy Lim failed to disclose this misuse of funds to Plaintiffs in an effort to procure their future investments.

48. Following the investment of Plaintiff Matt Auffenberg on February 1, 2023, Andy Lim transferred $65,000.00 to Mr. Lim's personal account through a series of transfers. See Note 4 attached hereto as Exhibit D.

49. Following the investment of James Auffenberg in February 2022, Mr. Lim transferred $100,000.00 to his personal account.

50. Defendant Lim, on information and belief, made transfers to himself of $10,000 on 3/8/22, $15,000 on 2/1/23, $25,000 on 2/3/23, and $25,000 on 2/6/23.  None of this self dealing was ever disclosed to either plaintiff.

51. From May 2020 to December 2023, there were roughly $520,000.00 in charges on the corporate American Express card although it was still maintained in the name of Addmi LLC rather than the corporate entity.

52. Andy Lim failed to disclose these transfers to Plaintiffs in an effort to procure their future investments.

53. Throughout the period of investment, Mr. Lim used the corporate credit card to pay for personal and household expenses, including plane tickets for his family, lodging for his family and vacations.  This credit card bill was paid by the corporation.

54. Further, it is believed Mr. Lim made a personal investment in a cannabis business with company assets.

55. All of these violated the stated terms of the contract which were relied on by Plaintiffs when making the investment.

56. Defendant Lim allowed the corporation to be declared void and "no longer in existence and good standing under the laws of the state of Delaware having

become inoperative and void the first day of March, A.D. 2023 for non-payment of taxes."

57. So, despite receiving these loans of millions of dollars, Andy Lim chose to enrich himself rather than pay the taxes owed by the corporation.

58. Defendant committed multiple acts of misrepresentation and omission by which he intended to induce Plaintiffs to invest in Addmi when he knew he had no intention of using the money to grow the company as described to them when soliciting the investment.

59. Defendant's fraudulent conduct was intentional.

60. Plaintiffs justifiably relied on the acts and omissions of the Defendant to their detriment.

61. Defendant's misrepresentations and omissions proximately caused Plaintiffs to invest in Addmi, establishing transaction causation.

62.  Defendant's misrepresentations and omissions proximately caused Plaintiffs to suffer substantial monetary damages and economic injuries that continue to accrue.

63. Defendant's fraudulent conduct shocks the conscience.

64. Defendant acted with malice or reckless indifference to the likelihood

their conduct would harm Plaintiffs financially.  In addition to actual and consequential damages, punitive damages are necessary to punish these wrongdoers and deter others from like misconduct.

WHEREFORE, Plaintiffs pray this Court enter its Judgment against Defendant, including compensatory and punitive damages, costs and any further relief this Court deems just and proper.

## COUNT IV – COMMON LAW FRAUD – ANDY LIM

65. Plaintiff re-alleges ¶¶1-64 as if fully stated herein.

66. Based on the results of previous discovery in both this case and the bankruptcy case, the loans were acquired through fraud by Mr. Lim.

67. Additionally, Mr. Lim has, on information and belief, during the pendency of this claim, and knowing he would likely have to answer for this fraud, transferred his residence and other assets to other entities, including his home which was transferred via quitclaim deed on September 11, 2023 to a trust created August 17, 2023, titled DragonLim Family Trust.

68. Defendant Lim testified in the Addmi bankruptcy that he repaid loans made by Mr. Lim and there are still loans from Mr. Lim to the corporation.  None of these alleged loans were ever disclosed to plaintiffs.

69. Each of the Notes at issue, contain similar terms, including Section 3(ix) which explicitly states "The Company shall use the proceeds of this Note solely for the

operations of its business, and not for any personal, family or household

purpose.

70. Defendant Lim never had any intention of using the proceeds for the company,

but instead almost immediately started using the money for household expenses.

71. On information and belief, Defendant Andy Lim has violated the terms of the

Notes by comingling funds, using corporate funds for his personal, family or

household use rather than exclusively for the operations of its business.

72. Following the first wire from Plaintiff Matt Auffenberg in May of 2020, within a

week, Andy Lim paid himself $29,500.00 via company to check.  The check was

both written and signed by Andy Lim for his benefit.  See Note 1 attached as

Exhibit A.

73. Andy Lim failed to disclose this misuse of funds to Plaintiffs in an effort to

procure their future investments.

74. Following the investment of Plaintiff Matt Auffenberg on February 1, 2023, Andy

Lim transferred $65,000.00 to Mr. Lim's personal account through a series of

transfers.  See Note 4 attached as Exhibit D.

75. On January 4, 2021, Defendant Lim made a transfer directly to himself from the

corporate account for $1,499.44.

76. Following the investment of James Auffenberg in February 2022, Mr. Lim

transferred $100,000.00 to his personal account.

77. Defendant Lim, on information and belief, made transfers to himself of $10,000 on 3/8/22, $15,000 on 2/1/23, $25,000 on 2/3/23, and $25,000 on 2/6/23. None of this self dealing was ever disclosed to either plaintiff.

78. From May 2020 to December 2023, there were roughly $520,000.00 in charges on the corporate American Express card although it was still maintained in the name of Addmi LLC rather than the corporate entity.

79. That at least a portion of those charges were for household expenses, family travel and for other items for Mr. Lim's personal use.

80. These charges were paid by the corporation from its Bank of America account.

81. Andy Lim failed to disclose these transfers to Plaintiffs in an effort to procure their future investments.

82. Throughout the period of investment, Mr. Lim used the corporate credit card to pay for personal and household expenses, including plane tickets for his family, lodging for his family and vacations. This credit card bill was paid by the corporation.

83. Defendant Addmi, through its agent, Andy Lim, failed to follow corporate formalities by using corporate assets to pay for household expenses, co-mingling assets, and generally self-dealing.

84. This co-mingling of assets, coupled with the fraudulent acts and self-dealing, is sufficient to pierce the corporate veil and render Mr. Lim personally responsible.

85. Further, it is believed Mr. Lim made a personal investment in a cannabis business with company assets.

86. All of these violated the stated terms of the contract which were relied on by Plaintiffs when making the investment. Defendant Lim never had any intention to abide by the terms of the agreement and procured the agreement by fraud as described above.

87. Defendant Lim allowed the corporation to be declared void and "no longer in existence and good standing under the laws of the state of Delaware having become inoperative and void the first day of March, A.D. 2023 for non-payment of taxes."

88. So, despite receiving these loans of millions of dollars, Andy Lim chose to enrich himself rather than pay the taxes owed by the corporation.

89. Defendant committed multiple acts of misrepresentation and omission by which he intended to induce Plaintiffs to invest in Addmi when he knew he had no intention of using the money to grow the company as described to them when soliciting the investment.

90. Defendant's fraudulent conduct was intentional.

91. Plaintiffs justifiably relied on the acts and omissions of the Defendant to their detriment.

92. Defendant's misrepresentations and omissions proximately caused Plaintiffs to invest in Addmi, establishing transaction causation.

93. Defendant's misrepresentations and omissions proximately caused Plaintiffs to suffer substantial monetary damages and economic injuries that continue to accrue.

94. Defendant's fraudulent conduct shocks the conscience.

95. Defendant acted with malice or reckless indifference to the likelihood their conduct would harm Plaintiffs financially. In addition to actual and consequential damages, punitive damages are necessary to punish these wrongdoers and deter others from like misconduct.

WHEREFORE, Plaintiffs pray this Court enter its Judgment against Defendant, including compensatory and punitive damages, costs and any further relief this Court deems just and proper.

Respectfully Submitted,

/s Jarrod P. Beasley
Jarrod P. Beasley #6274536
Attorney for Plaintiffs
Kuehn, Beasley & Young, P.C.
23 S. First St.
Belleville, IL 62220
Phone: 618.277.7260
Fax: 618.277.7718
jarrodbeasley@kuehnlawfirm.com

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, on the 24th day of November 2025, emailed a copy of this document, addressed to:

SUMMERS COMPTON WELLS, LLC
Andrew R. Magdy, #60390MO
903 S. Lindbergh Blvd., Ste. 200
St. Louis, MO 63131
Ph: 314-991-4999
amagdy@summerscomptonwells.com
Attorney for Defendant

/s/Erin Kelley_____
Erin Kelley
Kuehn, Beasley & Young, P.C.

DocuSign Envelope ID: 111BDF13-E87F-47AC-B732-7627504457D6

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF
HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED
(THE "*ACT*"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED
STATES.    THESE    SECURITIES    ARE    SUBJECT    TO    RESTRICTIONS    ON
TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD
EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES
LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF
THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND
SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED
TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE
STATE SECURITIES LAWS.

## CONVERTIBLE PROMISSORY NOTE

| | |
|---|---|
| Note Series: | 2020-Seed |
| Date of Note: | May 13, 2020 |
| Principal Amount of Note: | $300,000.00 |

For value received ADDMI, INC., a Delaware corporation (the "*Company*"), promises to pay
to the undersigned holder or such party's assigns (the "*Holder*") the principal amount set forth
above with simple interest on the outstanding principal amount at the rate of 7% per annum.
Interest shall commence with the date hereof and shall continue on the outstanding principal
amount until paid in full or converted. Interest shall be computed on the basis of a year of 365 days
for the actual number of days elapsed.  All unpaid interest and principal shall be due and payable
upon request of the Majority Holders on or after May 12, 2022 (the "*Maturity Date*").

1.    BASIC TERMS.

(a)    **Series of Notes**.  This convertible promissory note (the "*Note*") is issued as
part of a series of notes designated by the Note Series above (collectively, the "*Notes*") and issued
in a series of multiple closings to certain persons and entities (collectively, the "*Holders*").  The
Company shall maintain a ledger of all Holders.

(b)    **Payments**.  All payments of interest and principal shall be in lawful money
of the United States of America and shall be made pro rata among all Holders. All payments shall
be applied first to accrued interest, and thereafter to principal.

(c)    **Prepayment**.  The Company may not prepay this Note prior to the Maturity
Date without the consent of the Holders of a majority of the outstanding principal amount of the
Notes (the "*Majority Holders*").

2.    CONVERSION AND REPAYMENT.

(a)    **Conversion upon a Qualified Financing**.  In the event that the Company



issues and sells shares of its equity securities ( *"Equity Securities"*) to investors (the *"Investors"*) while this Note remains outstanding in an equity financing with total proceeds to the Company of not less than $4,000,000 (excluding the conversion of the Notes or other convertible securities issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)) (a *"Qualified Financing"*), then the outstanding principal amount of this Note and any unpaid accrued interest shall automatically convert in whole without any further action by the Holder into Equity Securities sold in the Qualified Financing at a conversion price equal to the cash price paid per share for Equity Securities by the Investors in the Qualified Financing multiplied by 0.85. The issuance of Equity Securities pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions applicable to Equity Securities sold in the Qualified Financing. Notwithstanding this paragraph, if the conversion price of the Notes as determined pursuant to this paragraph (the *"Conversion Price"*) is less than the price per share at which Equity Securities are issued in the Qualified Financing, the Company may, solely at its option, elect to convert this Note into shares of a newly created series of preferred stock having the identical rights, privileges, preferences and restrictions as the Equity Securities issued in the Qualified Financing, and otherwise on the same terms and conditions, other than with respect to (if applicable): (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the per share dividend, which will be the same percentage of the Conversion Price as applied to determine the per share dividends of the Investors in the Qualified Financing relative to the purchase price paid by the Investors.

(b)    **Change of Control.**  If the Company consummates a Change of Control (as defined below) while this Note remains outstanding, the Company shall repay the Holder in cash in an amount equal to the outstanding principal amount of this Note plus any unpaid accrued interest on the original principal.  For purposes of this Note, a *"Change of Control"* means (i) a consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the shares of capital stock of the Company immediately prior to such consolidation, merger or reorganization continue to represent a majority of the voting power of the surviving entity immediately after such consolidation, merger or reorganization; (ii) any transaction or series of related transactions to which the Company is a party in which in excess of 50% of the Company's voting power is transferred; or (iii) the sale or transfer of all or substantially all of the Company's assets, or the exclusive license of all or substantially all of the Company's material intellectual property; provided that a Change of Control shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor, indebtedness of the Company is cancelled or converted or a combination thereof. The Company shall give the Holder notice of a Change of Control not less than 10 days prior to the anticipated date of consummation of the Change of Control.   Any repayment pursuant to this paragraph in connection with a Change of Control shall be subject to any required tax withholdings, and may be made by the Company (or any party to such Change of Control or its agent) following the Change of Control in connection with payment procedures established in connection with such Change of Control.

(c)    **Procedure for Conversion.**  In connection with any conversion of this Note into capital stock, the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of a Qualified Financing, all financing documents executed by the Investors in connection with such Qualified

Financing). The Company shall not be required to issue or deliver the capital stock into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. Upon the conversion of this Note into capital stock pursuant to the terms hereof, in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts.

       **(d)**    **Interest Accrual.** If a Change of Control or Qualified Financing is consummated, all interest on this Note shall be deemed to have stopped accruing as of a date selected by the Company that is up to 10 days prior to the signing of the definitive agreement for the Change of Control or Qualified Financing.

    3.    REPRESENTATIONS AND WARRANTIES.

       **(a)**    **Representations and Warranties of the Company.** The Company hereby represents and warrants to the Holder as of the date the first Note was issued as follows:

       **(i)**    **Organization, Good Standing and Qualification.** The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has the requisite corporate power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Company or its business (a "*Material Adverse Effect*").

       **(ii)**    **Corporate Power.** The Company has all requisite corporate power to issue this Note and to carry out and perform its obligations under this Note. The Company's Board of Directors (the "*Board*") has approved the issuance of this Note based upon a reasonable belief that the issuance of this Note is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation.

       **(iii)**    **Authorization.** All corporate action on the part of the Company, the Board and the Company's stockholders necessary for the issuance and delivery of this Note has been taken. This Note constitutes a valid and binding obligation of the Company enforceable in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws. Any securities issued upon conversion of this Note (the "*Conversion Securities*"), when issued in compliance with the provisions of this Note, will be validly issued, fully paid, nonassessable, free of any liens or encumbrances and issued in compliance with all applicable federal and securities laws.

       **(iv)**    **Governmental Consents.** All consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any governmental authority required on the part of the Company in connection with issuance of this Note has been obtained.

(v)    **Compliance with Laws**.  To its knowledge. the Company is not in violation of any applicable statute. rule. regulation. order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties. which violation of which would have a Material Adverse Effect.

(vi)    **Compliance with Other Instruments**.  The Company is not in violation or default of any term of its certificate of incorporation or bylaws. or of any provision of any mortgage. indenture or contract to which it is a party and by which it is bound or of any judgment. decree. order or writ. other than such violation(s) that would not have a Material Adverse Effect. The execution. delivery and performance of this Note will not result in any such violation or be in conflict with. or constitute. with or without the passage of time and giving of notice. either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension. revocation. impairment. forfeiture. or nonrenewal of any material permit. license. authorization or approval applicable to the Company, its business or operations or any of its assets or properties.  Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights. rights of first refusal or similar rights. including any notice or offering periods provided for as part of any such rights. in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

(vii)    **No "Bad Actor" Disqualification**.  The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii). as modified by Rules 506(d)(2) and (d)(3). under the Act (*"Disqualification Events"*).  To the Company's knowledge. no Company Covered Person is subject to a Disqualification Event.  The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act.  For purposes of this Note. *"Company Covered Persons"* are those persons specified in Rule 506(d)(1) under the Act: provided. however. that Company Covered Persons do not include (a) any Holder, or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and any Holder.

(viii)    **Offering**.  Assuming the accuracy of the representations and warranties of the Holder contained in subsection (b) below. the offer, issue, and sale of this Note and the Conversion Securities (collectively, the *"Securities"*) are and will be exempt from the registration and prospectus delivery requirements of the Act. and have been registered or qualified (or are exempt from registration and qualification) under the registration. permit or qualification requirements of all applicable state securities laws.

(ix)    **Use of Proceeds**.  The Company shall use the proceeds of this Note solely for the operations of its business. and not for any personal. family or household purpose.

(b)    **Representations and Warranties of the Holder**.  The Holder hereby represents and warrants to the Company as of the date hereof as follows:

(i)      **Purchase for Own Account**.  The Holder is acquiring the Securities solely for the Holder's own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

(ii)      **Information and Sophistication**.  Without lessening or obviating the representations and warranties of the Company set forth in subsection (a) above, the Holder hereby: (A) acknowledges that the Holder has received all the information the Holder has requested from the Company and the Holder considers necessary or appropriate for deciding whether to acquire the Securities, (B) represents that the Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Holder and (C) further represents that the Holder has such knowledge and experience in financial and business matters that the Holder is capable of evaluating the merits and risk of this investment.

(iii)      **Ability to Bear Economic Risk**.  The Holder acknowledges that investment in the Securities involves a high degree of risk, and represents that the Holder is able, without materially impairing the Holder's financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of the Holder's investment.

(iv)      **Further Limitations on Disposition**.  Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Securities unless and until:

(1)      There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(2)      The Holder shall have notified the Company of the proposed disposition and furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, the Holder shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws; provided that no such opinion shall be required for dispositions in compliance with Rule 144 under the Act, except in unusual circumstances.

(3)      Notwithstanding the provisions of paragraphs (1) and (2) above, no such registration statement or opinion of counsel shall be necessary for a transfer by the Holder to a partner (or retired partner) or member (or retired member) of the Holder in accordance with partnership or limited liability company interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Holders hereunder.

(v)      **Accredited Investor Status**.  The Holder is an "accredited investor" as such term is defined in Rule 501 under the Act.

DocuSign Envelope ID: 111BDF13-E87F-47AC-B732-7627504457D6

(vi)    **No "Bad Actor" Disqualification**.  The Holder represents and warrants that neither (A) the Holder nor (B) any entity that controls the Holder or is under the control of, or under common control with, the Holder, is subject to any Disqualification Event, except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act and disclosed in writing in reasonable detail to the Company.  The Holder represents that the Holder has exercised reasonable care to determine the accuracy of the representation made by the Holder in this paragraph, and agrees to notify the Company if the Holder becomes aware of any fact that makes the representation given by the Holder hereunder inaccurate.

(vii)    **Foreign Investors**.  If the Holder is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), the Holder hereby represents that he, she or it has satisfied itself as to the full observance of the laws of the Holder's jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Note, including (A) the legal requirements within the Holder's jurisdiction for the purchase of the Securities, (B) any foreign exchange restrictions applicable to such purchase, (C) any governmental or other consents that may need to be obtained, and (D) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities.  The Holder's subscription, payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Holder's jurisdiction.

(viii)    **Forward-Looking Statements**.  With respect to any forecasts, projections of results and other forward-looking statements and information provided to the Holder, the Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation.  There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

4.    **EVENTS OF DEFAULT.**

(a)    If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Majority Holders and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (ii) or (iii) below), this Note shall accelerate and all principal and unpaid accrued interest shall become due and payable. The occurrence of any one or more of the following shall constitute an "*Event of Default*":

(i)    The Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(ii)    The Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(iii)    An involuntary petition is filed against the Company (unless such petition is dismissed or discharged within 60 days under any bankruptcy statute now or hereafter

6

DocuSign Envelope ID: 111BDF13-E87F-47AC-B732-7627504457D6

in effect. or a custodian. receiver. trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession. custody or control of any property of the Company).

(b)    In the event of any Event of Default hereunder. the Company shall pay all reasonable attorneys' fees and court costs incurred by the Holder in enforcing and collecting this Note.

5.    MISCELLANEOUS PROVISIONS.

(a)    **Waivers.**  The Company hereby waives demand. notice. presentment. protest and notice of dishonor.

(b)    **Further Assurances**.  The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

(c)    **Transfers of Notes**.  This Note may be transferred only upon its surrender to the Company for registration of transfer. duly endorsed. or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon. this Note shall be reissued to. and registered in the name of. the transferee. or a new Note for like principal amount and interest shall be issued to. and registered in the name of. the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

(d)    **Amendment and Waiver**.  Any term of this Note may be amended or waived with the written consent of the Company and the Holder.  In addition. any term of this Note may be amended or waived with the written consent of the Company and the Majority Holders. Upon the effectuation of such waiver or amendment with the consent of the Majority Holders in conformance with this paragraph. such amendment or waiver shall be effective as to. and binding against the holders of. all of the Notes and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment or waiver in writing: provided that the failure to give such notice shall not affect the validity of such amendment or waiver.

(e)    **Governing Law**.  This Note shall be governed by and construed under the laws of the State of Delaware. as applied to agreements among Delaware residents. made and to be performed entirely within the State of Delaware. without giving effect to conflicts of laws principles.

(f)    **Binding Agreement**.  The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Note. expressed or implied. is intended to confer upon any third party any rights. remedies. obligations or liabilities under or by reason of this Note. except as expressly provided in this Note.

(g)    **Counterparts; Manner of Delivery**.  This Note may be executed in two or more counterparts. each of which shall be deemed an original. but all of which together shall

constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

        **(h)**    **Titles and Subtitles**. The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

        **(i)**    **Notices**. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (iii) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications to a party shall be sent to the party's address set forth on the signature page hereto or at such other address(es) as such party may designate by 10 days' advance written notice to the other party hereto.

        **(j)**    **Expenses**. The Company and the Holder shall each bear its respective expenses and legal fees incurred with respect to the negotiation, execution and delivery of this Note and the transactions contemplated herein.

        **(k)**    **Delays or Omissions**. It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by the Holder of any breach or default under this Note, or any waiver by the Holder of any provisions or conditions of this Note, must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to the Holder, shall be cumulative and not alternative. This Note shall be void and of no force or effect in the event that the Holder fails to remit the full principal amount to the Company within five calendar days of the date of this Note.

        **(l)**    **Entire Agreement**. This Note constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof, and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

        **(m)**    **Exculpation among Holders**. The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and Board members, in making its investment or decision to invest in the Company.

DocuSign Envelope ID: 111BDF13-E87F-47AC-B732-7627504457D6

(n)    **Senior Indebtedness**.    The indebtedness evidenced by this Note is subordinated in right of payment to the prior payment in full of any Senior Indebtedness in existence on the date of this Note or hereafter incurred. *"**Senior Indebtedness**"* shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, all amounts due in connection with (i) indebtedness of the Company to banks or other lending institutions regularly engaged in the business of lending money (excluding venture capital, investment banking or similar institutions and their affiliates, which sometimes engage in lending activities but which are primarily engaged in investments in equity securities), and (ii) any such indebtedness or any debentures, notes or other evidence of indebtedness issued in exchange for such Senior Indebtedness, or any indebtedness arising from the satisfaction of such Senior Indebtedness by a guarantor.

(o)    **Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(p)    **California Corporate Securities Law**.    THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS NOTE HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR IN THE ABSENCE OF AN EXEMPTION FROM SUCH QUALIFICATION IS UNLAWFUL.  PRIOR TO ACCEPTANCE OF SUCH CONSIDERATION BY THE COMPANY, THE RIGHTS OF ALL PARTIES TO THIS NOTE ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION FROM SUCH QUALIFICATION BEING AVAILABLE.

*[Signature pages follow]*

DocuSign Envelope ID: 111BDF13-E87F-47AC-B732-7627504457D6

The parties have executed this CONVERTIBLE PROMISSORY NOTE as of the date first noted above.


COMPANY:

ADDMI, INC.
a Delaware corporation


By: _____

     Name:   Andy Lim
     Title:    Chief Executive Officer


E-mail:     andy@addmi.com

Address:    201 Coal Ave SW
              Albuquerque. NM 87102

DocuSign Envelope ID: 111BDF13-E87F-47AC-B732-7627504457D6

The parties have executed this **CONVERTIBLE PROMISSORY NOTE** as of the date first noted above.

## HOLDER (if an entity):

Name of Holder: _____

By: _____

Name: _____
Title: _____

E-mail: _____

Address: _____
_____
_____

## HOLDER (if an individual):

Name of Holder:  Matthew Auffenberg

Signature:  *Matthew Auffenberg*
DocuSigned by:
E9FBBA855C0F401...

E-mail:  matt@auffenberg.com

Address:  2332 Fourlakes Drive
Belleville, Illinois 62220
USA

SIGNATURE PAGE TO
ADDML INC
CONVERTIBLE PROMISSORY NOTE

DocuSign Envelope ID: 1086A173-F648-46C8-808A-1316204B4EE7

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF
HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED
(THE "*ACT*"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED
STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON
TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD
EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES
LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF
THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND
SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED
TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE
STATE SECURITIES LAWS.

## CONVERTIBLE PROMISSORY NOTE

| | |
|---|---|
| Note Series: | 2020-Seed |
| Date of Note: | June 29, 2020 |
| Principal Amount of Note: | $200,000.00 |

For value received ADDMI, INC., a Delaware corporation (the "*Company*"), promises to pay
to the undersigned holder or such party's assigns (the "*Holder*") the principal amount set forth
above with simple interest on the outstanding principal amount at the rate of 7% per annum.
Interest shall commence with the date hereof and shall continue on the outstanding principal
amount until paid in full or converted. Interest shall be computed on the basis of a year of 365 days
for the actual number of days elapsed. All unpaid interest and principal shall be due and payable
upon request of the Majority Holders on or after May 12, 2022 (the "*Maturity Date*").

1.    BASIC TERMS.

(a)    **Series of Notes.** This convertible promissory note (the "*Note*") is issued as
part of a series of notes designated by the Note Series above (collectively, the "*Notes*") and issued
in a series of multiple closings to certain persons and entities (collectively, the "*Holders*"). The
Company shall maintain a ledger of all Holders.

(b)    **Payments.** All payments of interest and principal shall be in lawful money
of the United States of America and shall be made pro rata among all Holders. All payments shall
be applied first to accrued interest, and thereafter to principal.

(c)    **Prepayment.** The Company may not prepay this Note prior to the Maturity
Date without the consent of the Holders of a majority of the outstanding principal amount of the
Notes (the "*Majority Holders*").

2.    CONVERSION AND REPAYMENT.

(a)    **Conversion upon a Qualified Financing.** In the event that the Company



PLAINTIFF'S
EXHIBIT
Dobbles
B

issues and sells shares of its equity securities ("*Equity Securities*") to investors (the "*Investors*") while this Note remains outstanding in an equity financing with total proceeds to the Company of not less than $4,000,000 (excluding the conversion of the Notes or other convertible securities issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)) (a "*Qualified Financing*"), then the outstanding principal amount of this Note and any unpaid accrued interest shall automatically convert in whole without any further action by the Holder into Equity Securities sold in the Qualified Financing at a conversion price equal to the cash price paid per share for Equity Securities by the Investors in the Qualified Financing multiplied by 0.85. The issuance of Equity Securities pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions applicable to Equity Securities sold in the Qualified Financing. Notwithstanding this paragraph, if the conversion price of the Notes as determined pursuant to this paragraph (the "*Conversion Price*") is less than the price per share at which Equity Securities are issued in the Qualified Financing, the Company may, solely at its option, elect to convert this Note into shares of a newly created series of preferred stock having the identical rights, privileges, preferences and restrictions as the Equity Securities issued in the Qualified Financing, and otherwise on the same terms and conditions, other than with respect to (if applicable): (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the per share dividend, which will be the same percentage of the Conversion Price as applied to determine the per share dividends of the Investors in the Qualified Financing relative to the purchase price paid by the Investors.

(b)    **Change of Control**. If the Company consummates a Change of Control (as defined below) while this Note remains outstanding, the Company shall repay the Holder in cash in an amount equal to the outstanding principal amount of this Note plus any unpaid accrued interest on the original principal. For purposes of this Note, a "*Change of Control*" means (i) a consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the shares of capital stock of the Company immediately prior to such consolidation, merger or reorganization continue to represent a majority of the voting power of the surviving entity immediately after such consolidation, merger or reorganization; (ii) any transaction or series of related transactions to which the Company is a party in which in excess of 50% of the Company's voting power is transferred; or (iii) the sale or transfer of all or substantially all of the Company's assets, or the exclusive license of all or substantially all of the Company's material intellectual property; provided that a Change of Control shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor, indebtedness of the Company is cancelled or converted or a combination thereof. The Company shall give the Holder notice of a Change of Control not less than 10 days prior to the anticipated date of consummation of the Change of Control. Any repayment pursuant to this paragraph in connection with a Change of Control shall be subject to any required tax withholdings, and may be made by the Company (or any party to such Change of Control or its agent) following the Change of Control in connection with payment procedures established in connection with such Change of Control.

(c)    **Procedure for Conversion**. In connection with any conversion of this Note into capital stock, the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of a Qualified Financing, all financing documents executed by the Investors in connection with such Qualified

Financing). The Company shall not be required to issue or deliver the capital stock into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. Upon the conversion of this Note into capital stock pursuant to the terms hereof. in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts.

(d)     **Interest Accrual**. If a Change of Control or Qualified Financing is consummated. all interest on this Note shall be deemed to have stopped accruing as of a date selected by the Company that is up to 10 days prior to the signing of the definitive agreement for the Change of Control or Qualified Financing.

3.     REPRESENTATIONS AND WARRANTIES.

(a)     **Representations and Warranties of the Company**. The Company hereby represents and warrants to the Holder as of the date the first Note was issued as follows:

(i)     **Organization, Good Standing and Qualification**. The Company is a corporation duly organized. validly existing and in good standing under the laws of the State of Delaware. The Company has the requisite corporate power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Company or its business (a "*Material Adverse Effect*").

(ii)     **Corporate Power**. The Company has all requisite corporate power to issue this Note and to carry out and perform its obligations under this Note. The Company's Board of Directors (the "*Board*") has approved the issuance of this Note based upon a reasonable belief that the issuance of this Note is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation.

(iii)     **Authorization**. All corporate action on the part of the Company. the Board and the Company's stockholders necessary for the issuance and delivery of this Note has been taken. This Note constitutes a valid and binding obligation of the Company enforceable in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency. the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws. Any securities issued upon conversion of this Note (the "*Conversion Securities*"). when issued in compliance with the provisions of this Note, will be validly issued, fully paid. nonassessable. free of any liens or encumbrances and issued in compliance with all applicable federal and securities laws.

(iv)     **Governmental Consents**. All consents. approvals. orders or authorizations of. or registrations. qualifications. designations. declarations or filings with, any governmental authority required on the part of the Company in connection with issuance of this Note has been obtained.

3

(v)     **Compliance with Laws.** To its knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation of which would have a Material Adverse Effect.

(vi)     **Compliance with Other Instruments.** The Company is not in violation or default of any term of its certificate of incorporation or bylaws, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would have a Material Adverse Effect. The execution, delivery and performance of this Note will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

(vii)     **No "Bad Actor" Disqualification.** The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("***Disqualification Events***"). To the Company's knowledge, no Company Covered Person is subject to a Disqualification Event. The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act. For purposes of this Note, "***Company Covered Persons***" are those persons specified in Rule 506(d)(1) under the Act; provided, however, that Company Covered Persons do not include (a) any Holder, or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and any Holder.

(viii)     **Offering.** Assuming the accuracy of the representations and warranties of the Holder contained in subsection (b) below, the offer, issue, and sale of this Note and the Conversion Securities (collectively, the "***Securities***") are and will be exempt from the registration and prospectus delivery requirements of the Act, and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities laws.

(ix)     **Use of Proceeds.** The Company shall use the proceeds of this Note solely for the operations of its business, and not for any personal, family or household purpose.

(b)     **Representations and Warranties of the Holder.** The Holder hereby represents and warrants to the Company as of the date hereof as follows:

4

DocuSign Envelope ID: 1086A173-F648-46C8-808A-1316204B4EE7

(i)      **Purchase for Own Account.** The Holder is acquiring the Securities solely for the Holder's own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

(ii)      **Information and Sophistication.** Without lessening or obviating the representations and warranties of the Company set forth in subsection (a) above, the Holder hereby: (A) acknowledges that the Holder has received all the information the Holder has requested from the Company and the Holder considers necessary or appropriate for deciding whether to acquire the Securities, (B) represents that the Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Holder and (C) further represents that the Holder has such knowledge and experience in financial and business matters that the Holder is capable of evaluating the merits and risk of this investment.

(iii)      **Ability to Bear Economic Risk.** The Holder acknowledges that investment in the Securities involves a high degree of risk, and represents that the Holder is able, without materially impairing the Holder's financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of the Holder's investment.

(iv)      **Further Limitations on Disposition.** Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Securities unless and until:

(1)      There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(2)      The Holder shall have notified the Company of the proposed disposition and furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, the Holder shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws; provided that no such opinion shall be required for dispositions in compliance with Rule 144 under the Act, except in unusual circumstances.

(3)      Notwithstanding the provisions of paragraphs (1) and (2) above, no such registration statement or opinion of counsel shall be necessary for a transfer by the Holder to a partner (or retired partner) or member (or retired member) of the Holder in accordance with partnership or limited liability company interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Holders hereunder.

(v)      **Accredited Investor Status.** The Holder is an "accredited investor" as such term is defined in Rule 501 under the Act.

5

(vi)    **No "Bad Actor" Disqualification.**  The Holder represents and warrants that neither (A) the Holder nor (B) any entity that controls the Holder or is under the control of, or under common control with, the Holder, is subject to any Disqualification Event, except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act and disclosed in writing in reasonable detail to the Company.  The Holder represents that the Holder has exercised reasonable care to determine the accuracy of the representation made by the Holder in this paragraph, and agrees to notify the Company if the Holder becomes aware of any fact that makes the representation given by the Holder hereunder inaccurate.

(vii)    **Foreign Investors.**  If the Holder is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), the Holder hereby represents that he, she or it has satisfied itself as to the full observance of the laws of the Holder's jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Note, including (A) the legal requirements within the Holder's jurisdiction for the purchase of the Securities, (B) any foreign exchange restrictions applicable to such purchase, (C) any governmental or other consents that may need to be obtained, and (D) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities.  The Holder's subscription, payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Holder's jurisdiction.

(viii)    **Forward-Looking Statements.**  With respect to any forecasts, projections of results and other forward-looking statements and information provided to the Holder, the Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation.  There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

4.    EVENTS OF DEFAULT.

(a)    If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Majority Holders and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (ii) or (iii) below), this Note shall accelerate and all principal and unpaid accrued interest shall become due and payable. The occurrence of any one or more of the following shall constitute an "*Event of Default*":

(i)    The Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(ii)    The Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(iii)    An involuntary petition is filed against the Company (unless such petition is dismissed or discharged within 60 days under any bankruptcy statute now or hereafter

DocuSign Envelope ID: 1086A173-F648-46C8-808A-1316204B4EE7

in effect, or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company).

(b)    In the event of any Event of Default hereunder, the Company shall pay all reasonable attorneys' fees and court costs incurred by the Holder in enforcing and collecting this Note.

5.    MISCELLANEOUS PROVISIONS.

(a)    **Waivers.**  The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

(b)    **Further Assurances.**  The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

(c)    **Transfers of Notes.**  This Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

(d)    **Amendment and Waiver.**  Any term of this Note may be amended or waived with the written consent of the Company and the Holder. In addition, any term of this Note may be amended or waived with the written consent of the Company and the Majority Holders. Upon the effectuation of such waiver or amendment with the consent of the Majority Holders in conformance with this paragraph, such amendment or waiver shall be effective as to, and binding against the holders of, all of the Notes and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment or waiver in writing; provided that the failure to give such notice shall not affect the validity of such amendment or waiver.

(e)    **Governing Law.**  This Note shall be governed by and construed under the laws of the State of Delaware, as applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware, without giving effect to conflicts of laws principles.

(f)    **Binding Agreement.**  The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

(g)    **Counterparts; Manner of Delivery.**  This Note may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall

DocuSign Envelope ID: 1086A173-F648-46C8-808A-1316204B4EE7

constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

(h)    **Titles and Subtitles**. The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

(i)    **Notices**. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (iii) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications to a party shall be sent to the party's address set forth on the signature page hereto or at such other address(es) as such party may designate by 10 days' advance written notice to the other party hereto.

(j)    **Expenses**. The Company and the Holder shall each bear its respective expenses and legal fees incurred with respect to the negotiation, execution and delivery of this Note and the transactions contemplated herein.

(k)    **Delays or Omissions**. It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by the Holder of any breach or default under this Note, or any waiver by the Holder of any provisions or conditions of this Note, must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to the Holder, shall be cumulative and not alternative. This Note shall be void and of no force or effect in the event that the Holder fails to remit the full principal amount to the Company within five calendar days of the date of this Note.

(l)    **Entire Agreement**. This Note constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof, and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

(m)    **Exculpation among Holders**. The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and Board members, in making its investment or decision to invest in the Company.

8

(n)    **Senior Indebtedness**.  The indebtedness evidenced by this Note is subordinated in right of payment to the prior payment in full of any Senior Indebtedness in existence on the date of this Note or hereafter incurred. "*Senior Indebtedness*" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, all amounts due in connection with (i) indebtedness of the Company to banks or other lending institutions regularly engaged in the business of lending money (excluding venture capital, investment banking or similar institutions and their affiliates, which sometimes engage in lending activities but which are primarily engaged in investments in equity securities), and (ii) any such indebtedness or any debentures, notes or other evidence of indebtedness issued in exchange for such Senior Indebtedness, or any indebtedness arising from the satisfaction of such Senior Indebtedness by a guarantor.

(o)    **Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(p)    **California Corporate Securities Law**.  THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS NOTE HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR IN THE ABSENCE OF AN EXEMPTION FROM SUCH QUALIFICATION IS UNLAWFUL.  PRIOR TO ACCEPTANCE OF SUCH CONSIDERATION BY THE COMPANY, THE RIGHTS OF ALL PARTIES TO THIS NOTE ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION FROM SUCH QUALIFICATION BEING AVAILABLE.

*[Signature pages follow]*

DocuSign Envelope ID: 1086A173-F648-46C8-808A-1316204B4EE7

The parties have executed this CONVERTIBLE PROMISSORY NOTE as of the date first noted above.

COMPANY:

ADDMI, INC.
a Delaware corporation

By: _____
Name:   Andy Lim
Title:   Chief Executive Officer

E-mail:        andy@addmi.com

Address:      201 Coal Ave SW
              Albuquerque. NM 87102

SIGNATURE PAGE TO
ADDMI, INC.
CONVERTIBLE PROMISSORY NOTE

DocuSign Envelope ID: 1086A173-F648-46C8-808A-1316204B4EE7

The parties have executed this **CONVERTIBLE PROMISSORY NOTE** as of the date first noted above.

**HOLDER (if an entity):**

Name of Holder: _____

By: _____

Name: _____
Title: _____

E-mail: _____

Address: _____
_____
_____

**HOLDER (if an individual):**

Name of Holder:  Matthew Auffenberg

Signature:  _____

E-mail:  matt@auffenberg.com

Address:  2332 Fourlakes Drive
Belleville, IL 62220
USA

DocuSign Envelope ID: 623448BE-8A8A-4E36-824D-7DDB5E079CE8

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

## CONVERTIBLE PROMISSORY NOTE

| | |
|---|---|
| Note Series: | 2020-Seed |
| Date of Note: | August 31, 2020 |
| Principal Amount of Note: | $500,000.00 |

For value received ADDMI, INC., a Delaware corporation (the "*Company*"), promises to pay to the undersigned holder or such party's assigns (the "*Holder*") the principal amount set forth above with simple interest on the outstanding principal amount at the rate of 7% per annum. Interest shall commence with the date hereof and shall continue on the outstanding principal amount until paid in full or converted. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. All unpaid interest and principal shall be due and payable upon request of the Majority Holders on or after May 12, 2022 (the "*Maturity Date*").

1.    BASIC TERMS.

(a)    **Series of Notes.** This convertible promissory note (the "*Note*") is issued as part of a series of notes designated by the Note Series above (collectively, the "*Notes*") and issued in a series of multiple closings to certain persons and entities (collectively, the "*Holders*"). The Company shall maintain a ledger of all Holders.

(b)    **Payments.** All payments of interest and principal shall be in lawful money of the United States of America and shall be made pro rata among all Holders. All payments shall be applied first to accrued interest, and thereafter to principal.

(c)    **Prepayment.** The Company may not prepay this Note prior to the Maturity Date without the consent of the Holders of a majority of the outstanding principal amount of the Notes (the "*Majority Holders*").

2.    CONVERSION AND REPAYMENT.

(a)    **Conversion upon a Qualified Financing.** In the event that the Company


PLAINTIFF'S EXHIBIT
C

issues and sells shares of its equity securities ( "*Equity Securities*") to investors (the "*Investors*")
while this Note remains outstanding in an equity financing with total proceeds to the Company of
not less than $4,000,000 (excluding the conversion of the Notes or other convertible securities
issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)) (a "*Qualified
Financing*"), then the outstanding principal amount of this Note and any unpaid accrued interest
shall automatically convert in whole without any further action by the Holder into Equity
Securities sold in the Qualified Financing at a conversion price equal to the cash price paid per
share for Equity Securities by the Investors in the Qualified Financing multiplied by 0.85. The
issuance of Equity Securities pursuant to the conversion of this Note shall be upon and subject to
the same terms and conditions applicable to Equity Securities sold in the Qualified Financing.
Notwithstanding this paragraph, if the conversion price of the Notes as determined pursuant to this
paragraph (the "*Conversion Price*") is less than the price per share at which Equity Securities are
issued in the Qualified Financing, the Company may, solely at its option, elect to convert this Note
into shares of a newly created series of preferred stock having the identical rights, privileges,
preferences and restrictions as the Equity Securities issued in the Qualified Financing, and
otherwise on the same terms and conditions, other than with respect to (if applicable): (i) the per
share liquidation preference and the conversion price for purposes of price-based anti-dilution
protection, which will equal the Conversion Price; and (ii) the per share dividend, which will be
the same percentage of the Conversion Price as applied to determine the per share dividends of the
Investors in the Qualified Financing relative to the purchase price paid by the Investors.

      (b)    **Change of Control.** If the Company consummates a Change of Control (as
defined below) while this Note remains outstanding, the Company shall repay the Holder in cash
in an amount equal to the outstanding principal amount of this Note plus any unpaid accrued
interest on the original principal. For purposes of this Note, a "*Change of Control*" means (i) a
consolidation or merger of the Company with or into any other corporation or other entity or
person, or any other corporate reorganization, other than any such consolidation, merger or
reorganization in which the shares of capital stock of the Company immediately prior to such
consolidation, merger or reorganization continue to represent a majority of the voting power of the
surviving entity immediately after such consolidation, merger or reorganization; (ii) any
transaction or series of related transactions to which the Company is a party in which in excess of
50% of the Company's voting power is transferred; or (iii) the sale or transfer of all or substantially
all of the Company's assets, or the exclusive license of all or substantially all of the Company's
material intellectual property; provided that a Change of Control shall not include any transaction
or series of transactions principally for bona fide equity financing purposes in which cash is
received by the Company or any successor, indebtedness of the Company is cancelled or converted
or a combination thereof. The Company shall give the Holder notice of a Change of Control not
less than 10 days prior to the anticipated date of consummation of the Change of Control.  Any
repayment pursuant to this paragraph in connection with a Change of Control shall be subject to
any required tax withholdings, and may be made by the Company (or any party to such Change of
Control or its agent) following the Change of Control in connection with payment procedures
established in connection with such Change of Control.

      (c)    **Procedure for Conversion**. In connection with any conversion of this Note
into capital stock, the Holder shall surrender this Note to the Company and deliver to the Company
any documentation reasonably required by the Company (including, in the case of a Qualified
Financing, all financing documents executed by the Investors in connection with such Qualified

Financing). The Company shall not be required to issue or deliver the capital stock into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. Upon the conversion of this Note into capital stock pursuant to the terms hereof, in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts.

(d)    **Interest Accrual.** If a Change of Control or Qualified Financing is consummated, all interest on this Note shall be deemed to have stopped accruing as of a date selected by the Company that is up to 10 days prior to the signing of the definitive agreement for the Change of Control or Qualified Financing.

3.    REPRESENTATIONS AND WARRANTIES.

(a)    **Representations and Warranties of the Company.** The Company hereby represents and warrants to the Holder as of the date the first Note was issued as follows:

(i)    **Organization, Good Standing and Qualification.** The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has the requisite corporate power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Company or its business (a "*Material Adverse Effect*").

(ii)    **Corporate Power.** The Company has all requisite corporate power to issue this Note and to carry out and perform its obligations under this Note. The Company's Board of Directors (the "*Board*") has approved the issuance of this Note based upon a reasonable belief that the issuance of this Note is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation.

(iii)    **Authorization.** All corporate action on the part of the Company, the Board and the Company's stockholders necessary for the issuance and delivery of this Note has been taken. This Note constitutes a valid and binding obligation of the Company enforceable in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws. Any securities issued upon conversion of this Note (the "*Conversion Securities*"), when issued in compliance with the provisions of this Note, will be validly issued, fully paid, nonassessable, free of any liens or encumbrances and issued in compliance with all applicable federal and securities laws.

(iv)    **Governmental Consents.** All consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any governmental authority required on the part of the Company in connection with issuance of this Note has been obtained.

3

DocuSign Envelope ID: 623448BE-8A8A-4E36-824D-7DDB5E079CE8

(v)    **Compliance with Laws.** To its knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation of which would have a Material Adverse Effect.

(vi)    **Compliance with Other Instruments.** The Company is not in violation or default of any term of its certificate of incorporation or bylaws, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect. The execution, delivery and performance of this Note will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

(vii)    **No "Bad Actor" Disqualification.** The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("*Disqualification Events*"). To the Company's knowledge, no Company Covered Person is subject to a Disqualification Event. The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act. For purposes of this Note, "*Company Covered Persons*" are those persons specified in Rule 506(d)(1) under the Act; provided, however, that Company Covered Persons do not include (a) any Holder, or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and any Holder.

(viii)    **Offering.** Assuming the accuracy of the representations and warranties of the Holder contained in subsection (b) below, the offer, issue, and sale of this Note and the Conversion Securities (collectively, the "*Securities*") are and will be exempt from the registration and prospectus delivery requirements of the Act, and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities laws.

(ix)    **Use of Proceeds.** The Company shall use the proceeds of this Note solely for the operations of its business, and not for any personal, family or household purpose.

(b)    **Representations and Warranties of the Holder.** The Holder hereby represents and warrants to the Company as of the date hereof as follows:

4

(i)   **Purchase for Own Account**. The Holder is acquiring the Securities solely for the Holder's own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

(ii)   **Information and Sophistication**. Without lessening or obviating the representations and warranties of the Company set forth in subsection (a) above, the Holder hereby: (A) acknowledges that the Holder has received all the information the Holder has requested from the Company and the Holder considers necessary or appropriate for deciding whether to acquire the Securities, (B) represents that the Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Holder and (C) further represents that the Holder has such knowledge and experience in financial and business matters that the Holder is capable of evaluating the merits and risk of this investment.

(iii)   **Ability to Bear Economic Risk**. The Holder acknowledges that investment in the Securities involves a high degree of risk, and represents that the Holder is able, without materially impairing the Holder's financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of the Holder's investment.

(iv)   **Further Limitations on Disposition**. Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Securities unless and until:

(1)   There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement: or

(2)   The Holder shall have notified the Company of the proposed disposition and furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, the Holder shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws: provided that no such opinion shall be required for dispositions in compliance with Rule 144 under the Act, except in unusual circumstances.

(3)   Notwithstanding the provisions of paragraphs (1) and (2) above, no such registration statement or opinion of counsel shall be necessary for a transfer by the Holder to a partner (or retired partner) or member (or retired member) of the Holder in accordance with partnership or limited liability company interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Holders hereunder.

(v)   **Accredited Investor Status**. The Holder is an "accredited investor" as such term is defined in Rule 501 under the Act.

(vi)    **No "Bad Actor" Disqualification**.  The Holder represents and
warrants that neither (A) the Holder nor (B) any entity that controls the Holder or is under the
control of, or under common control with, the Holder, is subject to any Disqualification Event,
except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act
and disclosed in writing in reasonable detail to the Company.  The Holder represents that the
Holder has exercised reasonable care to determine the accuracy of the representation made by the
Holder in this paragraph, and agrees to notify the Company if the Holder becomes aware of any
fact that makes the representation given by the Holder hereunder inaccurate.

(vii)    **Foreign Investors**.  If the Holder is not a United States person (as
defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")),
the Holder hereby represents that he, she or it has satisfied itself as to the full observance of the
laws of the Holder's jurisdiction in connection with any invitation to subscribe for the Securities
or any use of this Note, including (A) the legal requirements within the Holder's jurisdiction for
the purchase of the Securities, (B) any foreign exchange restrictions applicable to such purchase,
(C) any governmental or other consents that may need to be obtained, and (D) the income tax and
other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or
transfer of the Securities.  The Holder's subscription, payment for and continued beneficial
ownership of the Securities will not violate any applicable securities or other laws of the Holder's
jurisdiction.

(viii)    **Forward-Looking Statements**.  With respect to any forecasts,
projections of results and other forward-looking statements and information provided to the
Holder, the Holder acknowledges that such statements were prepared based upon assumptions
deemed reasonable by the Company at the time of preparation.  There is no assurance that such
statements will prove accurate, and the Company has no obligation to update such statements.

4.    EVENTS OF DEFAULT.

(a)    If there shall be any Event of Default (as defined below) hereunder, at the
option and upon the declaration of the Majority Holders and upon written notice to the Company
(which election and notice shall not be required in the case of an Event of Default under subsection
(ii) or (iii) below), this Note shall accelerate and all principal and unpaid accrued interest shall
become due and payable. The occurrence of any one or more of the following shall constitute an
"*Event of Default*":

(i)    The Company fails to pay timely any of the principal amount due
under this Note on the date the same becomes due and payable or any unpaid accrued interest or
other amounts due under this Note on the date the same becomes due and payable;

(ii)    The Company files any petition or action for relief under any
bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or
relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors
or takes any corporate action in furtherance of any of the foregoing; or

(iii)    An involuntary petition is filed against the Company (unless such
petition is dismissed or discharged within 60 days under any bankruptcy statute now or hereafter

6

DocuSign Envelope ID: 623448BE-8A8A-4E36-824D-7DDB5E079CE8

in effect, or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company).

(b)    In the event of any Event of Default hereunder, the Company shall pay all reasonable attorneys' fees and court costs incurred by the Holder in enforcing and collecting this Note.

5.    MISCELLANEOUS PROVISIONS.

(a)    **Waivers.**  The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

(b)    **Further Assurances.**  The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

(c)    **Transfers of Notes.**  This Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

(d)    **Amendment and Waiver.**  Any term of this Note may be amended or waived with the written consent of the Company and the Holder. In addition, any term of this Note may be amended or waived with the written consent of the Company and the Majority Holders. Upon the effectuation of such waiver or amendment with the consent of the Majority Holders in conformance with this paragraph, such amendment or waiver shall be effective as to, and binding against the holders of, all of the Notes and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment or waiver in writing; provided that the failure to give such notice shall not affect the validity of such amendment or waiver.

(e)    **Governing Law.**  This Note shall be governed by and construed under the laws of the State of Delaware, as applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware, without giving effect to conflicts of laws principles.

(f)    **Binding Agreement.**  The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

(g)    **Counterparts; Manner of Delivery.**  This Note may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall

constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

   **(h)**  **Titles and Subtitles**. The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

   **(i)**  **Notices**. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (iii) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications to a party shall be sent to the party's address set forth on the signature page hereto or at such other address(es) as such party may designate by 10 days' advance written notice to the other party hereto.

   **(j)**  **Expenses**. The Company and the Holder shall each bear its respective expenses and legal fees incurred with respect to the negotiation, execution and delivery of this Note and the transactions contemplated herein.

   **(k)**  **Delays or Omissions**. It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by the Holder of any breach or default under this Note, or any waiver by the Holder of any provisions or conditions of this Note, must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to the Holder, shall be cumulative and not alternative. This Note shall be void and of no force or effect in the event that the Holder fails to remit the full principal amount to the Company within five calendar days of the date of this Note.

   **(l)**  **Entire Agreement**. This Note constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof, and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

   **(m)**  **Exculpation among Holders**. The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and Board members, in making its investment or decision to invest in the Company.

(n)    **Senior Indebtedness.**    The indebtedness evidenced by this Note is subordinated in right of payment to the prior payment in full of any Senior Indebtedness in existence on the date of this Note or hereafter incurred. "*Senior Indebtedness*" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, all amounts due in connection with (i) indebtedness of the Company to banks or other lending institutions regularly engaged in the business of lending money (excluding venture capital, investment banking or similar institutions and their affiliates, which sometimes engage in lending activities but which are primarily engaged in investments in equity securities), and (ii) any such indebtedness or any debentures, notes or other evidence of indebtedness issued in exchange for such Senior Indebtedness, or any indebtedness arising from the satisfaction of such Senior Indebtedness by a guarantor.

(o)    **Broker's Fees.** Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(p)    **California Corporate Securities Law.**    THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS NOTE HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR IN THE ABSENCE OF AN EXEMPTION FROM SUCH QUALIFICATION IS UNLAWFUL.   PRIOR TO ACCEPTANCE OF SUCH CONSIDERATION BY THE COMPANY, THE RIGHTS OF ALL PARTIES TO THIS NOTE ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION FROM SUCH QUALIFICATION BEING AVAILABLE.

*[Signature pages follow]*

9

The parties have executed this **CONVERTIBLE PROMISSORY NOTE** as of the date first noted above.

**COMPANY:**

**ADDMI, INC.**
a Delaware corporation

By: _____
Name:   Andy Lim
Title:   Chief Executive Officer


E-mail:       andy@addmi.com

Address:      201 Coal Ave SW
              Albuquerque, NM 87102

DocuSign Envelope ID: 623448BE-8A8A-4E36-824D-7DDB5E079CE8

The parties have executed this **CONVERTIBLE PROMISSORY NOTE** as of the date first noted above.

### HOLDER (if an entity):

Name of Holder: _____

By: _____

Name: _____
Title: _____

E-mail: _____

Address: _____
_____
_____

### HOLDER (if an individual):

Name of Holder:   Matthew Auffenberg

Signature:   _[DocuSigned by signature]_
F9EF8A855C0F401

E-mail:   Matt@auffenberg.com

Address:   2332 Fourlakes Drive
Belleville, Illinois 62220
USA

DocuSign Envelope ID: 759F159B-4FEF-435D-9391-73592104DCB9

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT
BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR
UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE
SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND
MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND
THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR
EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION
OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT
THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY
APPLICABLE STATE SECURITIES LAWS.

**CONVERTIBLE PROMISSORY NOTE**

Date of Note:  2/2/2023

Principal Amount of Note:  $ 325,000

For value received ADDMI, INC., a Delaware corporation (the "*Company*"), promises to pay to
the undersigned holder or such party's assigns (the "*Holder*") the principal amount set forth above with
simple interest on the outstanding principal amount at the rate of 7.0% per annum. Interest shall
commence with the date hereof and shall continue on the outstanding principal amount until paid in full
or converted. Interest shall be computed on the basis of a year of 365 days for the actual number of days
elapsed. All unpaid interest and principal shall be due and payable, if not otherwise converted prior to
Nov 1st, 2023 (the "*Maturity Date*"), unless an extension of the maturity date is mutually agreed upon in
writing by both The Company and the Holder.

1.    BASIC TERMS.

     (a)    Series of Notes.  This convertible promissory note (the "*Note*") is or may be
issued as part of a series of notes (collectively, the "*Notes*") and delivered in a series of multiple
closings to certain persons and entities (collectively, the "*Holders*").   The Company shall
maintain a ledger of all Holders.

     (b)    Payments.  All payments of interest and principal shall be in lawful money of the
United States of America and shall be made pro rata among all Holders. All payments shall be
applied first to accrued interest, and thereafter to principal.

     (c)    Prepayment.  The Company may not prepay this Note prior to the Maturity Date
without the consent of the Holders of a majority of the outstanding principal amount of the Notes
(the "*Majority Holders*").

2.    CONVERSION AND REPAYMENT.

     (a)    Conversion upon a Qualified Financing.  In the event that the Company issues
and sells shares of its equity securities ( "*Equity Securities*") to investors (the "*Investors*") on or
before the Maturity Date in a bona fide equity financing with total proceeds to the Company of
not less than $4,500,000 (including the conversion of the Notes or other convertible securities
issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)) (a "*Qualified*

---

EXHIBIT TO CONVERTIBLE PROMISSORY NOTE – AddMi, Inc.



PLAINTIFF'S
EXHIBIT

D

DocuSign Envelope ID: 7B9F158B-4FEF-435D-9391-73992104DC89

Financing"), then the outstanding principal amount of this Note and any unpaid accrued interest shall automatically convert in whole without any further action by the Holder into Equity Securities sold in the Qualified Financing at a conversion price equal to the cash price paid per share for Equity Securities by the Investors in the Qualified Financing multiplied by 0.85. The issuance of Equity Securities pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions applicable to Equity Securities sold in the Qualified Financing.

(b)   **Change of Control.**   If the Company consummates a Change of Control (as defined below) while this Note remains outstanding, the Company shall repay the Holder in cash in an amount equal to the outstanding principal amount of this Note plus any unpaid accrued interest on the original principal; *provided, however,* that upon the written election of the Holder made not less than five days prior to the Change of Control, the Company shall convert the outstanding principal balance of this Note and any unpaid accrued interest into shares of the Company's Common Stock at a conversion price equal to the price per share of the Company's Common Stock, at the time immediately prior to the Change of Control (assuming conversion of all securities convertible into Common Stock and exercise of all outstanding options and warrants, but excluding the shares of equity securities of the Company issuable upon the conversion of Notes or other convertible securities issued for capital raising purposes (*e.g.,* Simple Agreements for Future Equity)). For purposes of this Note, a "*Change of Control*" means (i) a consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the shares of capital stock of the Company immediately prior to such consolidation, merger or reorganization continue to represent a majority of the voting power of the surviving entity immediately after such consolidation, merger or reorganization; (ii) any transaction or series of related transactions to which the Company is a party in which in excess of 50% of the Company's voting power is transferred; or (iii) the sale or transfer of all or substantially all of the Company's assets, or the exclusive license of all or substantially all of the Company's material intellectual property; provided that a Change of Control shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor, indebtedness of the Company is cancelled or converted or a combination thereof. The Company shall give the Holder notice of a Change of Control not less than 10 days prior to the anticipated date of consummation of the Change of Control.    Any repayment pursuant to this paragraph in connection with a Change of Control shall be subject to any required tax withholdings, and may be made by the Company (or any party to such Change of Control or its agent) following the Change of Control in connection with payment procedures established in connection with such Change of Control.

(c)   **Procedure for Conversion.**   In connection with any conversion of this Note into capital stock, the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of a Qualified Financing, all financing documents executed by the Investors in connection with such Qualified Financing). The Company shall not be required to issue or deliver the capital stock into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation.   Upon the conversion of this Note into capital stock pursuant to the terms hereof, in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts.

(d)   **Interest Accrual.**   If a Change of Control or Qualified Financing is consummated, all interest on this Note shall be deemed to have stopped accruing as of a date

selected by the Company that is up to 10 days prior to the signing of the definitive agreement for the Change of Control or Qualified Financing.

**3.    REPRESENTATIONS AND WARRANTIES.**

(a)    **Representations and Warranties of the Company.**  The Company hereby represents and warrants to the Holder as of the date the first Note was issued as follows:

(i)    **Organization, Good Standing and Qualification.**  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has the requisite corporate power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Company or its business (a *"Material Adverse Effect"*).

(ii)    **Corporate Power.**  The Company has all requisite corporate power to issue this Note and to carry out and perform its obligations under this Note. The Company's Board of Directors (the *"Board"*) has approved the issuance of this Note based upon a reasonable belief that the issuance of this Note is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation.

(iii)    **Authorization.**  All corporate action on the part of the Company and the Board necessary for the issuance and delivery of this Note has been taken. This Note constitutes a valid and binding obligation of the Company enforceable in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws. Any securities issued upon conversion of this Note (the *"Conversion Securities"*), when issued in compliance with the provisions of this Note, will be validly issued, fully paid, nonassessable, free of any liens or encumbrances and issued in compliance with all applicable federal and securities laws.

(iv)    **Governmental Consents.**  All consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any governmental authority required on the part of the Company in connection with issuance of this Note has been obtained.

(v)    **Compliance with Laws.**  To its knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation of which would have a Material Adverse Effect.

(vi)    **Compliance with Other Instruments.**  The Company is not in violation or default of any term of its certificate of incorporation or bylaws, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect. The execution, delivery and performance of this Note will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an

DocuSign Envelope ID: 199F158B-4FEF-435D-9391-73992704DCB9

event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

(vii)    **No "Bad Actor" Disqualification.**    The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("*Disqualification Events*").    To the Company's knowledge, no Company Covered Person is subject to a Disqualification Event. The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act.    For purposes of this Note, "*Company Covered Persons*" are those persons specified in Rule 506(d)(1) under the Act; provided, however, that Company Covered Persons do not include (a) any Holder, or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and any Holder.

(viii)    **Offering.** Assuming the accuracy of the representations and warranties of the Holder contained in subsection (b) below, the offer, issue, and sale of this Note and the Conversion Securities (collectively, the "*Securities*") are and will be exempt from the registration and prospectus delivery requirements of the Act, and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit, or qualification requirements of all applicable state securities laws.

(ix)    **Use of Proceeds.**    The Company shall use the proceeds of this Note solely for the operations of its business, and not for any personal, family or household purpose.

**(b)**    **Representations and Warranties of the Holder.**    The Holder hereby represents and warrants to the Company as of the date hereof as follows:

(i)    **Purchase for Own Account.**    The Holder is acquiring the Securities solely for the Holder's own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention. The Holder maintains the Holder's domicile, and is not merely a transient or temporary resident, at the residence address shown on the signature page of this Agreement.

(ii)    **Information and Sophistication.**    Without lessening or obviating the representations and warranties of the Company set forth in subsection (a) above, the Holder hereby: (A) acknowledges that the Holder has received all the information the Holder has requested from the Company and the Holder considers necessary or appropriate for deciding whether to acquire the Securities, (B) represents that the Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Holder and (C) further represents that the Holder has such

knowledge and experience in financial and business matters that the Holder is capable of evaluating the merits and risk of this investment.

(iii)    **Ability to Bear Economic Risk.**    The Holder acknowledges that investment in the Securities involves a high degree of risk, and represents that the Holder is able, without materially impairing the Holder's financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of the Holder's investment.    Holder understands the Company has broad discretion with respect to the use of the proceeds of this offering. Holder understands the Company has a limited operating history upon which Holder may access the Company's potential for future success.

(iv)    **Further Limitations on Disposition.**  Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Securities unless and until:

(1)    There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(2)    The Holder shall have notified the Company of the proposed disposition and furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, the Holder shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws; provided that no such opinion shall be required for dispositions in compliance with Rule 144 under the Act, except in unusual circumstances.

(3)    Notwithstanding the provisions of paragraphs (1) and (2) above, no such registration statement or opinion of counsel shall be necessary for a transfer by the Holder to a partner (or retired partner) or member (or retired member) of the Holder in accordance with partnership or limited liability company interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Holders hereunder.

(v)    **Accredited Investor Status.**  The Holder is an "accredited investor" as such term is defined in Rule 501 under the Act.

(vi)    **No "Bad Actor" Disqualification.**  The Holder represents and warrants that neither (A) the Holder nor (B) any entity that controls the Holder or is under the control of, or under common control with, the Holder, is subject to any Disqualification Event, except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act and disclosed in writing in reasonable detail to the Company.    The Holder represents that the Holder has exercised reasonable care to determine the accuracy of the representation made by the Holder in this paragraph, and agrees to notify the Company if the Holder becomes aware of any fact that makes the representation given by the Holder hereunder inaccurate.

(vii)    **Foreign Investors.**  If the Holder is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), the Holder hereby represents that he, she or it has satisfied itself as to the full observance of the laws of the Holder's jurisdiction in connection with any invitation to subscribe for the Securities

or any use of this Note, including (A) the legal requirements within the Holder's jurisdiction for the purchase of the Securities, (B) any foreign exchange restrictions applicable to such purchase, (C) any governmental or other consents that may need to be obtained, and (D) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities. The Holder's subscription, payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Holder's jurisdiction.

(viii)    The Holder acknowledges that the Company will not accept the investment of funds by any investor acting, directly or indirectly, in contravention of any applicable anti-money laundering regulations or conventions of the United States or any applicable international jurisdictions, or on behalf of terrorists, terrorist organizations, or narcotics traffickers, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Financial Action Task Force on Money Laundering of Organization for Economic Cooperation and Development, Office of Foreign Assets Control of the U.S. Department of the Treasury ("*OFAC*"), the U.S. Securities and Exchange Commission ("*SEC*"), U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, or U.S. Internal Revenue Service, all as such regulations and conventions may be amended from time to time ("*Prohibited Investments*"). The Holder's subscription for the Notes is not a Prohibited Investment. Federal regulations and Executive Orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC (the "**OFAC Programs**") prohibit dealing with individuals[1] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

(ix)    **Forward-Looking Statements**.    With respect to any forecasts, projections of results and other forward-looking statements and information provided to the Holder, the Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation. There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

4.    **Collateral**.    As security interest for the payment and performance of the note liabilities, the Company hereby grants a security interest to each note Holder in all of the Company's right, title. and interest in and to all of the Company's tangible and intangible, including without limitation its' cash, cash equivalents, accounts receivable, inventory in all forms, contracts, chattel paper, instruments, deposit accounts, equipment, property, furniture, furnishings, fixed assets, and all general intangibles, including without limitation, software, software code, code repos, git repos, frameworks, source codes, patents, trademarks, copyrights, service marks, and the like, and any and all other assets (collectively, the "Collateral"), wherever located and whether now or hereafter existing, and whether now owned or hereafter acquired and all parts and proceeds thereof and accessions thereto and,    to the extent not otherwise included, all payments under insurance, or any indemnity, warranty, or guaranty, payable by reason of loss or otherwise with respect to any of the foregoing collateral; in each case, howsoever the Company's interests therein may arise or appear (whether by ownership, license, security interest, claim or otherwise). It is the Company's express intention that the continuing grant of this security interest remain as security for payment and performance of its' note liabilities. The notice of the continuing grant of this

---

[1] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

DocuSign Envelope ID: 439F1369-4FEF-435F-9391-73992104DC89

security interest therefore shall not be required to be stated on the face of any document representing any of the liabilities nor otherwise identify it as being secured hereby.

5.    EVENTS OF DEFAULT.

(a)    If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Majority Holders and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (ii) or (iii) below), this Note shall accelerate and all principal and unpaid accrued interest shall become due and payable. The occurrence of any one or more of the following shall constitute an *"Event of Default"*:

(i)    The Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(ii)    The Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(iii)    An involuntary petition is filed against the Company (unless such petition is dismissed or discharged within 60 days under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company).

(iv)    Any Event of Default that is not cured within 30 days of declaration or written notice to the Company by any Holder, shall be deemed uncured, hereafter ( "Uncured Event of Default").

6.    In the event of any Event of Default hereunder, the Company shall pay all reasonable attorneys' fees and court costs incurred by the Holder in enforcing and collecting this Note.

7.    **Remedies of Default.**  Upon the occurrence of an Event of Default, the Holder shall be entitled to exercise any and all rights and remedies available to a secured party by applicable law, in addition to the rights and remedies provided in this agreement and the Convertible Promissory Note, or any other instrument or document furnished in connection therewith. In the event of an Uncured Event of Default, the Holder and or Majority Holders, on behalf of current and previous holders, may upon written notice, require the Company to assemble the Collateral, assign to and make it available to the Holder and or Majority Holders at a place and time which shall be mutually agreed upon, but no longer than 30 days.

8.    **Debtors Rights Until Default.**  In the absence of any Event of Default or Uncured Event of Default, the company shall have the right to possess the Collateral and manage its' property in the ordinary course of business.

9.    MISCELLANEOUS PROVISIONS.

(a)    **Waivers.** The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

**(b)     Further Assurances.**  The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

**(c)     Transfers of Notes.**  This Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

**(d)     Market Standoff.**  To the extent requested by the Company or an underwriter of securities of the Company, the Holder and any permitted transferee thereof shall not, without the prior written consent of the managing underwriters in the IPO (as hereafter defined), offer, sell, make any short sale of, grant or sell any option for the purchase of, lend, pledge, otherwise transfer or dispose of (directly or indirectly), enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership (whether any such transaction is described above or is to be settled by delivery of Securities or other securities, in cash, or otherwise), any Securities or other shares of stock of the Company then owned by the Holder or any transferee thereof, or enter into an agreement to do any of the foregoing,  for up to 180 days following the effective date of the registration statement of the initial public offering of the Company (the "*IPO*") filed under the Securities Act. For purposes of this paragraph, "*Company*" includes any wholly owned subsidiary of the Company into which the Company merges or consolidates. The Company may place restrictive legends on the certificates representing the shares subject to this paragraph and may impose stop transfer instructions with respect to the Securities and such other shares of stock of the Holder and any transferee thereof (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period. The Holder and any transferee thereof shall enter into any agreement reasonably required by the underwriters to the IPO to implement the foregoing within any reasonable timeframe so requested.   The underwriters for any IPO are intended third party beneficiaries of this paragraph and shall have the right, power and authority to enforce the provisions of this paragraph as though they were parties hereto.

**(e)     Amendment and Waiver.**  Any term of this Note may be amended or waived with the written consent of the Company and the Holder. In addition, any term of this Note may be amended or waived with the written consent of the Company and the Majority Holders. Upon the effectuation of such waiver or amendment with the consent of the Majority Holders in conformance with this paragraph, such amendment or waiver shall be effective as to, and binding against the holders of, all of the Notes and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment or waiver in writing; provided that the failure to give such notice shall not affect the validity of such amendment or waiver.

**(f)     Governing Law.**  This Note shall be governed by and construed under the laws of the State of Delaware, as applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware, without giving effect to conflicts of laws principles.

**(g)    Binding Agreement.** The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

**(h)    Counterparts; Manner of Delivery.** This Note may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**(i)    Titles and Subtitles.** The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

**(j)    Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (iii) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications to a party shall be sent to the party's address set forth on the signature page hereto or at such other address(es) as such party may designate by 10 days' advance written notice to the other party hereto.

**(k)    Expenses.** The Company and the Holder shall each bear its respective expenses and legal fees incurred with respect to the negotiation, execution and delivery of this Note and the transactions contemplated herein.

**(l)    Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by the Holder of any breach or default under this Note, or any waiver by the Holder of any provisions or conditions of this Note, must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to the Holder, shall be cumulative and not alternative. This Note shall be void and of no force or effect in the event that the Holder fails to remit the full principal amount to the Company within five calendar days of the date of this Note.

**(m)    Entire Agreement.** This Note constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof, and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

DocuSign Envelope ID: 1994188D-4FEF-435B-9391-73992104DC89

(n)     **Exculpation among Holders.**  The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and Board members, in making its investment or decision to invest in the Company.

(o)     **Senior Indebtedness.**  The indebtedness evidenced by this Note is subordinated in right of payment to the prior payment in full of any Senior Indebtedness in existence on the date ·of this Note or hereafter incurred. "*Senior Indebtedness*" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, all amounts due in connection with (i) indebtedness of the Company to banks or other lending institutions regularly engaged in the business of lending money (excluding venture capital, investment banking or similar institutions and their affiliates, which sometimes engage in lending activities but which are primarily engaged in investments in equity securities), and (ii) any such indebtedness or any debentures, notes or other evidence of indebtedness issued in exchange for such Senior Indebtedness, or any indebtedness arising from the satisfaction of such Senior Indebtedness by a guarantor.

(p)     **Broker's Fees.**  Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(q)     **California Corporate Securities Law.**  THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS NOTE HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR IN THE ABSENCE OF AN EXEMPTION FROM SUCH QUALIFICATION IS UNLAWFUL. PRIOR TO ACCEPTANCE OF SUCH CONSIDERATION BY THE COMPANY, THE RIGHTS OF ALL PARTIES TO THIS NOTE ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION FROM SUCH QUALIFICATION BEING AVAILABLE.

(r)     The Holder will, severally and not jointly with any other Holders, indemnify and hold harmless the Company and its officers, directors, members, shareholders, partners, representatives, employees and agents, successors and assigns against any losses, obligations, claims, damages, liabilities, contingencies, judgments, fines, penalties, charges, costs (including, without limitation, court costs, reasonable attorneys' fees and costs of defense and investigation), amounts paid in settlement or expenses, joint or several (collectively, *"Company Claims"*), reasonably incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or the SEC, whether pending or threatened, whether or not an indemnified party is or may be a party thereto, to which any of them may become subject insofar as such Company Claims (or actions or proceedings, whether commenced or threatened, in respect thereof): (i) arise out of or are based upon any untrue statement or untrue statement of a material fact made by the Holder and contained in this Agreement; or (ii) arise out of or are based upon any breach by the Holder of any representation, warranty, or agreement made by the Holder contained herein; provided, however, and notwithstanding anything to the contrary, in no event shall the liability of the Holder pursuant to

DocuSign Envelope ID: 199F1586-4FEF-435D-8391-73992764DC89

this Section 3.1 exceed the amount of the Note that the Holder purchases pursuant to this
Agreement.

The parties have executed this CONVERTIBLE PROMISSORY NOTE as of the date first noted above.

COMPANY:

ADDMI, INC.

By: _____                      2/2/2023

    Name:   Andy Lim

    Title:    Chief Executive Officer

    E-mail:    andy@addmi.com

    Address:    7850 Jefferson NE, Suite 220

                   Albuquerque, NM 87109

DocuSign Envelope ID: 199F158D-4FEF-435D-9391-73992104DC89

The parties have executed this CONVERTIBLE PROMISSORY NOTE as of the date first noted above.

### HOLDER (if an entity):

Name of Holder: _____

By: _____

Name: _____

Title: _____

E-mail: _____

Address: _____

_____

_____

Check if Accredited Investor within
the Meaning of Rule 501 Under Regulation D. _____

DocuSign Envelope ID: 139F1588-4FEF-435B-9391-73992404BC69

**HOLDER (if an individual):**

Name of Holder:     matt auffenberg

Signature:

DocuSigned by:

E9FB8A655C0F401...

E-mail:

Address:     2332 Fourlakes Drive

---

**EXHIBIT TO CONVERTIBLE PROMISSORY NOTE – AddMi, Inc.**                    13.

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

## CONVERTIBLE PROMISSORY NOTE

Note Series:  2020-Seed

Date of Note:  _____

Principal Amount of Note:  $1,000,000

For value received ADDMI, INC., a Delaware corporation (the "*Company*"), promises to pay to the undersigned holder or such party's assigns (the "*Holder*") the principal amount set forth above with simple interest on the outstanding principal amount at the rate of 7% per annum in the following tranches (each a "*Tranche*"):

May 31, 2021 in the amount of $250,000

June 30, 2021 in the amount of $250,000

July 31, 2021 in the amount of $250,000

August 31, 2021 in the amount of $250,000

Interest shall commence upon the funding of each Tranche and shall continue on the outstanding principal amount until paid in full or converted. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. All unpaid interest and principal shall be due and payable upon request of the Majority Holders on or after May 12, 2022 (the "*Maturity Date*").

1.  BASIC TERMS.

(a)  Series of Notes. This convertible promissory note (the "*Note*") is issued as part of a series of notes designated by the Note Series above (collectively, the "*Notes*") and issued in a series of multiple closings to certain persons and entities (collectively, the "*Holders*"). The Company shall maintain a ledger of all Holders.

SIGNATURE PAGE TO
ADDMI, INC.
CONVERTIBLE PROMISSORY NOTE



(b)    **Payments.** All payments of interest and principal shall be in lawful money of the United States of America and shall be made pro rata among all Holders. All payments shall be applied first to accrued interest, and thereafter to principal.

(c)    **Prepayment.** The Company may not prepay this Note prior to the Maturity Date without the consent of the Holders of a majority of the outstanding principal amount of the Notes (the "*Majority Holders*").

2.    CONVERSION AND REPAYMENT.

(a)    **Conversion upon a Qualified Financing.** In the event that the Company issues and sells shares of its equity securities ("*Equity Securities*") to investors (the "*Investors*") while this Note remains outstanding in an equity financing with total proceeds to the Company of not less than $4,000,000 (excluding the conversion of the Notes or other convertible securities issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity)) (a "*Qualified Financing*"), then the outstanding principal amount of this Note and any unpaid accrued interest shall automatically convert in whole without any further action by the Holder into Equity Securities sold in the Qualified Financing at a conversion price equal to the cash price paid per share for Equity Securities by the Investors in the Qualified Financing multiplied by 0.85. The issuance of Equity Securities pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions applicable to Equity Securities sold in the Qualified Financing. Notwithstanding this paragraph, if the conversion price of the Notes as determined pursuant to this paragraph (the "*Conversion Price*") is less than the price per share at which Equity Securities are issued in the Qualified Financing, the Company may, solely at its option, elect to convert this Note into shares of a newly created series of preferred stock having the identical rights, privileges, preferences and restrictions as the Equity Securities issued in the Qualified Financing, and otherwise on the same terms and conditions, other than with respect to (if applicable): (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the per share dividend, which will be the same percentage of the Conversion Price as applied to determine the per share dividends of the Investors in the Qualified Financing relative to the purchase price paid by the Investors.

(b)    **Change of Control.** If the Company consummates a Change of Control (as defined below) while this Note remains outstanding, the Company shall repay the Holder in cash in an amount equal to the outstanding principal amount of this Note plus any unpaid accrued interest on the original principal. For purposes of this Note, a "*Change of Control*" means (i) a consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the shares of capital stock of the Company immediately prior to such consolidation, merger or reorganization continue to represent a majority of the voting power of the surviving entity immediately after such consolidation, merger or reorganization; (ii) any transaction or series of related transactions to which the Company is a party in which in excess of 50% of the Company's voting power is transferred; or (iii) the sale or transfer of all or substantially all of the Company's assets, or the exclusive license of all or substantially all of the Company's material intellectual property; provided that a Change of Control shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor, indebtedness of the Company is cancelled or converted

or a combination thereof. The Company shall give the Holder notice of a Change of Control not less than 10 days prior to the anticipated date of consummation of the Change of Control.   Any repayment pursuant to this paragraph in connection with a Change of Control shall be subject to any required tax withholdings, and may be made by the Company (or any party to such Change of Control or its agent) following the Change of Control in connection with payment procedures established in connection with such Change of Control.

(c)     **Procedure for Conversion**.  In connection with any conversion of this Note into capital stock, the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of a Qualified Financing, all financing documents executed by the Investors in connection with such Qualified Financing).  The Company shall not be required to issue or deliver the capital stock into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation.  Upon the conversion of this Note into capital stock pursuant to the terms hereof, in lieu of any fractional shares to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts.

(d)     **Interest Accrual**.  If a Change of Control or Qualified Financing is consummated, all interest on this Note shall be deemed to have stopped accruing as of a date selected by the Company that is up to 10 days prior to the signing of the definitive agreement for the Change of Control or Qualified Financing.

3.     REPRESENTATIONS AND WARRANTIES.

(a)     **Representations and Warranties of the Company**.  The Company hereby represents and warrants to the Holder as of the date this Note was issued as follows:

(i)     **Organization, Good Standing and Qualification**.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  The Company has the requisite corporate power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted.  The Company is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Company or its business (a "*Material Adverse Effect*").

(ii)     **Corporate Power**.  The Company has all requisite corporate power to issue this Note and to carry out and perform its obligations under this Note.  The Company's Board of Directors (the "*Board*") has approved the issuance of this Note based upon a reasonable belief that the issuance of this Note is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation.

(iii)     **Authorization**.  All corporate action on the part of the Company, the Board and the Company's stockholders necessary for the issuance and delivery of this Note has been taken.  This Note constitutes a valid and binding obligation of the Company enforceable

SIGNATURE PAGE TO
ADDMI, INC.
CONVERTIBLE PROMISSORY NOTE

in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws. Any securities issued upon conversion of this Note (the "*Conversion Securities*"), when issued in compliance with the provisions of this Note, will be validly issued, fully paid, nonassessable, free of any liens or encumbrances and issued in compliance with all applicable federal and securities laws.

(iv)    **Governmental Consents**.    All consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any governmental authority required on the part of the Company in connection with issuance of this Note has been obtained.

(v)    **Compliance with Laws**.    To its knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties, which violation of which would have a Material Adverse Effect.

(vi)    **Compliance with Other Instruments**.    The Company is not in violation or default of any term of its certificate of incorporation or bylaws, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect. The execution, delivery and performance of this Note will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

(vii)    **No "Bad Actor" Disqualification**.    The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("*Disqualification Events*"). To the Company's knowledge, no Company Covered Person is subject to a Disqualification Event. The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act. For purposes of this Note, "*Company Covered Persons*" are those persons specified in Rule 506(d)(1) under the Act; provided, however, that Company Covered Persons do not include (a) any Holder, or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and any Holder.

(viii)    **Offering**.    Assuming the accuracy of the representations and warranties of the Holder contained in subsection (b) below, the offer, issue, and sale of this Note

and the Conversion Securities (collectively, the "*Securities*") are and will be exempt from the registration and prospectus delivery requirements of the Act, and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities laws.

        **(ix)**    **Use of Proceeds**. The Company shall use the proceeds of this Note solely for the operations of its business, and not for any personal, family or household purpose.

      **(b)**    **Representations and Warranties of the Holder**.  The Holder hereby represents and warrants to the Company as of the date hereof as follows:

        **(i)**    **Purchase for Own Account**. The Holder is acquiring the Securities solely for the Holder's own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

        **(ii)**    **Information and Sophistication**.  Without lessening or obviating the representations and warranties of the Company set forth in subsection (a) above, the Holder hereby: (A) acknowledges that the Holder has received all the information the Holder has requested from the Company and the Holder considers necessary or appropriate for deciding whether to acquire the Securities, (B) represents that the Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Holder and (C) further represents that the Holder has such knowledge and experience in financial and business matters that Holder is capable of evaluating the merits and risk of this investment.

        **(iii)**    **Ability to Bear Economic Risk**.  The Holder acknowledges that investment in the Securities involves a high degree of risk, and represents that the Holder is able, without materially impairing the Holder's financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of the Holder's investment.

        **(iv)**    **Further Limitations on Disposition**.  Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Securities unless and until:

        **(1)**    There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

        **(2)**    The Holder shall have notified the Company of the proposed disposition and furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, the Holder shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws;

provided that no such opinion shall be required for dispositions in compliance with Rule 144 under the Act, except in unusual circumstances.

      **(3)** Notwithstanding the provisions of paragraphs (1) and (2) above, no such registration statement or opinion of counsel shall be necessary for a transfer by the Holder to a partner (or retired partner) or member (or retired member) of the Holder in accordance with partnership or limited liability company interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Holders hereunder.

      **(v)** **Accredited Investor Status.** The Holder is an "accredited investor" as such term is defined in Rule 501 under the Act.

      **(vi)** **No "Bad Actor" Disqualification.** The Holder represents and warrants that neither (A) the Holder nor (B) any entity that controls the Holder or is under the control of, or under common control with, the Holder, is subject to any Disqualification Event, except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act and disclosed in writing in reasonable detail to the Company. The Holder represents that the Holder has exercised reasonable care to determine the accuracy of the representation made by the Holder in this paragraph, and agrees to notify the Company if the Holder becomes aware of any fact that makes the representation given by the Holder hereunder inaccurate.

      **(vii)** **Foreign Investors.** If the Holder is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "*Code*")), the Holder hereby represents that he, she or it has satisfied itself as to the full observance of the laws of the Holder's jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Note, including (A) the legal requirements within the Holder's jurisdiction for the purchase of the Securities, (B) any foreign exchange restrictions applicable to such purchase, (C) any governmental or other consents that may need to be obtained, and (D) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities. The Holder's subscription, payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Holder's jurisdiction.

      **(viii)** **Forward-Looking Statements.** With respect to any forecasts, projections of results and other forward-looking statements and information provided to the Holder, the Holder acknowledges that such statements were prepared based upon assumptions deemed reasonable by the Company at the time of preparation. There is no assurance that such statements will prove accurate, and the Company has no obligation to update such statements.

    4.    EVENTS OF DEFAULT.

      (a) If there shall be any Event of Default (as defined below) hereunder, at the option and upon the declaration of the Majority Holders and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (ii) or (iii) below), this Note shall accelerate and all principal and unpaid accrued interest shall

become due and payable. The occurrence of any one or more of the following shall constitute an *"Event of Default"*:

> (i)     The Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable;

> (ii)     The Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

> (iii)     An involuntary petition is filed against the Company (unless such petition is dismissed or discharged within 60 days under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company).

> (b)     In the event of any Event of Default hereunder, the Company shall pay all reasonable attorneys' fees and court costs incurred by the Holder in enforcing and collecting this Note.

5.     **MISCELLANEOUS PROVISIONS.**

> (a)     **Waivers.**     The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

> (b)     **Further Assurances.**     The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.

> (c)     **Transfers of Notes.**     This Note may be transferred only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

> (d)     **Amendment and Waiver.**     Any term of this Note may be amended or waived with the written consent of the Company and the Holder.  In addition, any term of this Note may be amended or waived with the written consent of the Company and the Majority Holders. Upon the effectuation of such waiver or amendment with the consent of the Majority Holders in conformance with this paragraph, such amendment or waiver shall be effective as to, and binding against the holders of, all of the Notes and the Company shall promptly give written notice thereof to the Holder if the Holder has not previously consented to such amendment or

waiver in writing; provided that the failure to give such notice shall not affect the validity of such amendment or waiver.

(e)    **Governing Law.**  This Note shall be governed by and construed under the laws of the State of Delaware, as applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware, without giving effect to conflicts of laws principles.

(f)    **Binding Agreement.**  The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

(g)    **Counterparts; Manner of Delivery.**  This Note may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

(h)    **Titles and Subtitles.** The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

(i)    **Notices.**  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (iii) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications to a party shall be sent to the party's address set forth on the signature page hereto or at such other address(es) as such party may designate by 10 days' advance written notice to the other party hereto.

(j)    **Expenses.**  The Company and the Holder shall each bear its respective expenses and legal fees incurred with respect to the negotiation, execution and delivery of this Note and the transactions contemplated herein.

(k)    **Delays or Omissions.**  It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  It is further agreed that any waiver, permit, consent or approval of any kind or character by the Holder of any breach or default under this Note, or any waiver by the Holder of any provisions or conditions of this Note, must be in writing and shall be effective only to the extent specifically set forth in writing and that all

remedies, either under this Note, or by law or otherwise afforded to the Holder, shall be cumulative and not alternative. This Note shall be void and of no force or effect in the event that the Holder fails to remit the full principal amount to the Company within five calendar days of the date of this Note.

(l)    **Entire Agreement**. This Note constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof, and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

(m)    **Exculpation among Holders**. The Holder acknowledges that the Holder is not relying on any person, firm or corporation, other than the Company and its officers and Board members, in making its investment or decision to invest in the Company.

(n)    **Senior Indebtedness**.    The indebtedness evidenced by this Note is subordinated in right of payment to the prior payment in full of any Senior Indebtedness in existence on the date of this Note or hereafter incurred. "*Senior Indebtedness*" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, all amounts due in connection with (i) indebtedness of the Company to banks or other lending institutions regularly engaged in the business of lending money (excluding venture capital, investment banking or similar institutions and their affiliates, which sometimes engage in lending activities but which are primarily engaged in investments in equity securities), and (ii) any such indebtedness or any debentures, notes or other evidence of indebtedness issued in exchange for such Senior Indebtedness, or any indebtedness arising from the satisfaction of such Senior Indebtedness by a guarantor.

(o)    **Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this subsection being untrue.

(p)    **California Corporate Securities Law**.    THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS NOTE HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION OR IN THE ABSENCE OF AN EXEMPTION FROM SUCH QUALIFICATION IS UNLAWFUL. PRIOR TO ACCEPTANCE OF SUCH CONSIDERATION BY THE COMPANY, THE RIGHTS OF ALL PARTIES TO THIS NOTE ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED OR AN EXEMPTION FROM SUCH QUALIFICATION BEING AVAILABLE.

*[Signature pages follow]*

SIGNATURE PAGE TO
ADDMI, INC.
CONVERTIBLE PROMISSORY NOTE

The parties have executed this CONVERTIBLE PROMISSORY NOTE as of the date first noted above.

**COMPANY:**

ADDMI, INC.
a Delaware corporation

By: _____

      Name:    Andy Lim
      Title:     Chief Executive Officer

E-mail:    andy@addmi.com

Address:   201 Coal Ave SW
            Albuquerque, NM 87102

SIGNATURE PAGE TO
ADDMI, INC.
CONVERTIBLE PROMISSORY NOTE

The parties have executed this CONVERTIBLE PROMISSORY NOTE as of the date first noted above.

HOLDER (if an entity):

Name of Holder: _Auffenberg Enterprises of IL, Inc._

By: _James Auffenberg Jr_

Name: _James Auffenberg Jr_

Title: _President_

E-mail: _____

Address: _176 Auto Ct._
_O'Fallon, IL  62269_

HOLDER (if an individual):

Name of Holder: _____

Signature: _____

E-mail: _____

Address: _____
_____
_____

SIGNATURE PAGE TO
ADDMI, INC.
CONVERTIBLE PROMISSORY NOTE